**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lorena Torres, | No. CV-23-02535-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Zurich American Insurance Company, *et al.*, | |
| Defendants. | |

At issue is Defendant Zurich American Insurance Company's Motion for Partial Summary Judgment (Doc. 37, Motion),[1] to which Plaintiff Lorena Torres filed a Response (Doc. 39, Response) and Defendant filed a Reply (Doc. 41, Reply). Both parties have filed Statements of Facts in support of their legal memoranda (Doc. 38, DSOF; Doc. 40, PSOF). The Court finds these matters appropriate for resolution without oral argument. *See* LRCiv 7.2(f). For the reasons that follow, the Court grants Defendant's Motion.

**I.     Background**

This case involves a dispute regarding the manner by which Defendant processed Plaintiff's claim for workers' compensation insurance coverage following the unfortunate occurrence of a workplace injury. Although Plaintiff originally brought suit against both Defendant and an individual insurance adjuster named Terena Payton, (*see* Doc. 1), Plaintiff later voluntarily dismissed Ms. Payton as a party, (*see* Doc. 7). The only remaining

---

[1] This is Defendant's second motion for summary judgment, the first having been an unsuccessful pre-discovery motion that concerned threshold issues of claim preclusion and issue preclusion. (*See* Doc. 18; Doc. 34.)

claim in this case is Plaintiff's claim against Defendant for insurance bad faith. (*See* Doc. 1 at 8–9.) Defendant's Motion does not relate to the viability of Plaintiff's cause of action. Indeed, Defendant concedes that there exist triable issues related to Plaintiff's bad faith claim. (*See* Reply at 1, 3.) The Motion asserts that, irrespective of the merits or lack thereof of Plaintiff's underlying tort claim, punitive damages are not available. Accordingly, the Court does not herein consider whether there exist genuine disputes of material fact relating to Plaintiff's assertion that Defendant breached the duty of good faith and fair dealing. Rather, the Court directs its attention only to the question of whether there exist disputed facts that are materially relevant to the propriety of punitive damages. The facts, most of which are undisputed, are as follows.

Plaintiff sustained a workplace injury in August of 2022. (Response at 3.) In September of the same year, Plaintiff filed a claim for workers' compensation with Defendant, who designated Ms. Payton as the adjuster for Plaintiff's claim. (Response at 1.) Plaintiff's claim was immediately accepted, and she began to receive benefits. (DSOF ¶ 5; PSOF at 8.) However, Plaintiff's condition continued to worsen into October, at which time Defendant assigned a registered nurse named Amber Zadina to assist Ms. Payton with the coordination of Plaintiff's medical care. (Response at 3.) Plaintiff received an adverse spinal diagnosis in December, and in January of 2023 Plaintiff received a recommendation from one of her medical providers, Dr. Ladin, that she needed to consult with a surgeon as soon as possible to determine whether surgery was required. (Response at 3–4.) Plaintiff then attended a consultation with orthopedic surgeon Dr. Paul Gause, who determined that surgery was indeed necessary. (Response at 4.) On January 17, Dr. Gause faxed a "surgery auth request" to Ms. Zadina. (Response at 4.) Although the parties dispute the extent to which it may be assumed that Ms. Zadina apprised Ms. Payton of the contents of the fax, it is undisputed that the fax was sent only to Ms. Zadina. (DSOF ¶¶ 10–11; PSOF at 8.)

On February 6, Ms. Zadina transmitted a voicemail and an email to Ms. Payton, both of which pertained to the surgical request from Dr. Gause and inquired as to whether

Ms. Payton needed any additional information in order to act upon the request. (Response at 5.) Ms. Payton did not respond to either the voicemail or the email. (Response at 5.) On February 23, Ms. Zadina composed another email to Ms. Payton informing her of Dr. Gause's reiteration that surgery was urgently needed. (Response at 5–6.) Ms. Payton again did not respond. (Response at 6.) Ms. Zadina sent another similar email on March 1, to which Ms. Payton responded that she would check Plaintiff's file. (Response at 6.) Two weeks later, Ms. Zadina followed up again, this time indicating that Plaintiff was still waiting to see a shoulder specialist. (Response at 6.) The next day, Ms. Zadina transmitted two additional follow-up communications to Ms. Payton regarding the need for surgery and shoulder consultation, to which the latter responded that she would "get [Plaintiff] scheduled." (Response at 6–7.) Ms. Payton then began the process of procuring funding for Plaintiff's surgery, pending the results of the consultation with the shoulder specialist. (Response at 7.) On March 23, Plaintiff was again examined by Dr. Gause, who again determined that surgery was urgently needed. On March 27, Ms. Zadina sent an email to Ms. Payton seeking action on Dr. Gause's recommendation, and on March 29 Ms. Zadina followed up again. (Response at 7–8.) On March 30, Plaintiff directly contacted Ms. Payton regarding the surgical authorization, at which point Ms. Payton stated that she had never received the surgery authorization request form. (Response at 8.) That same day, Ms. Payton requested that Dr. Gause's office send both her and Defendant's Utilization Review department the surgery authorization request, which Dr. Gause's office promptly did. (Response at 8.)

On April 1, Defendant's "peer review physician," Dr. Kopacz, requested a peer-to-peer meeting with Dr. Gause for the purpose of assessing the propriety of the latter's surgery recommendation. (Motion at 3–4.) Dr. Gause did not respond to Dr. Kopacz's request. (Motion at 4.) Dr. Kopacz then declined to certify Plaintiff's need for surgery based on the written record alone. (Motion at 4.) Defendant's Utilization Review department therefore denied authorization of the requested surgery. (Motion at 4.) In the notice of denial was a description of a process by which Plaintiff could appeal the

disposition, including an invitation to Plaintiff's doctors to participate in the peer-to-peer discussion that Dr. Kopacz had attempted to initiate. (Motion at 4.) Rather than avail herself of these procedures, Plaintiff retained counsel and commenced an administrative action before the Industrial Commission of Arizona (ICA) on April 21. (Motion at 4; Response at 9; PSOF ¶ 36 & Ex. 19.) On May 1, Dr. Kopacz again attempted to establish communication with Dr. Gause, this time successfully. (Motion at 4.) On May 19, Dr. Gause transmitted a written record of his medical opinions regarding the surgery. (Motion at 4.) Finally, on June 9, Defendant authorized Plaintiff's surgery. (Response at 10.)

Although the parties diverge markedly in their respective assessments of where primary responsibility for the communicative breakdown lies, both parties agree that Ms. Payton erred in her handling of Plaintiff's claim. Indeed, Ms. Payton herself fully acknowledges as much. She has said that "[t]he delay was [her] error" and that "the issue [was] with [her]." (Response at 11.) She has acknowledged that her conduct was "wrong" and that she failed in her professional obligation to Plaintiff. (Response at 11–12.) While discussing the subject of her handling of Plaintiff's claim, Ms. Payton broke down in tears. (Reply at 5.) Nevertheless, Defendant did not discipline Ms. Payton, and Ms. Payton still received annual bonus pay at the end of 2023. (Response at 13.)

Defendant concedes that there exist numerous genuine disputes of material fact regarding whether and to what extent Defendant failed to process Plaintiff's claim consistent with the duty of good faith and fair dealing. The question here, however, is only whether a material factual dispute exists with respect to punitive damages such that the issue should be submitted to a jury.

**II.   Legal Standard**

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the

outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party carries this initial burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, as long as it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." (citation omitted)).

. . .

### III. Discussion

The Arizona Supreme Court recently clarified the standard by which courts in this state are to determine whether a plaintiff has established a *prima facie* entitlement to punitive damages such that the issue may go to the jury.

> To be entitled to punitive damages, once a plaintiff establishes that the defendant engaged in tortious conduct of any kind, intentional or negligent—that is, acted with an "evil hand" —the plaintiff must prove the defendant engaged in such conduct with an "evil mind." To establish an evil mind requires clear and convincing evidence that the defendant's actions either (1) intended to cause harm, (2) were motivated by spite, or (3) were outrageous, creating a "substantial risk of tremendous harm to others."

*Swift Transportation Co. of Ariz. L.L.C. v. Carman*, 253 Ariz. 499, 506 ¶ 22 (2022) (internal citations omitted) (quoting *Volz v. Coleman Co.*, 155 Ariz. 567, 570–71 (1987)). Here, Plaintiff does not allege that Defendant acted with an intent to cause harm or with a spiteful motive. Instead, Plaintiff rests her prayer for punitive damages upon an assertion that Defendant acted outrageously, thereby creating a substantial risk of tremendous harm to her. (Response at 3, 14.)

In *Swift*, the Arizona Supreme Court gave several examples of the categories of conduct that rise to the requisite level of outrageousness. These include criminal conduct, a continuing course of conduct where there is evidence that the defendant possessed knowledge of the past harm caused by that conduct, a pattern of dishonest or fraudulent conduct, and the commission of an act for an outrageous purpose even in the event that no significant harm results. *Swift*, 253 Ariz. at 506–07 ¶¶ 23–24 & n.2. The indispensable element for punitive damages is that there must be "something more" than that which is required of the underlying tort. *See Rawlings v. Apodaca*, 151 Ariz. 149, 161 (1986) (holding that "punitive damages may not be awarded in a bad faith tort case unless the evidence reflects 'something more' than the conduct necessary to establish the tort"). As the Arizona Supreme Court clarified in *Swift*, when a plaintiff seeks to recover punitive damages on the basis of allegedly outrageous conduct, the plaintiff "must establish that the defendant knew, or intentionally disregarded, facts that created an unreasonable risk of

- 6 -

physical harm—a risk substantially greater than that necessary to make his or her conduct negligent or even grossly negligent—and consciously disregarded that risk." *Swift*, 253 Ariz. at 507 ¶ 25. Here, Plaintiff has failed to make a *prima facie* showing that Defendant acted with "something more" than the level of wrongfulness necessary to establish the underlying tort of insurance bad faith.

Defendant cites numerous cases from the Arizona Supreme Court for the proposition that evidence supporting bad faith, without more, is insufficient for punitive damages. For instance, in *Filasky v. Preferred Risk Mut. Ins. Co.*, 152 Ariz. 591, 599 (1987), the high court held that:

> As already discussed, Preferred Risk's reasons for its dilatory settlement of Filasky's three claims were either groundless or inadequately investigated. This conduct supported the jury's conclusion that Preferred Risk acted in bad faith. However, evidence of "something more" than indifference to facts and failure to properly and timely investigate an insurance claim must exist before the trial court can instruct the jury on punitive damages. We have read the record and conclude that evidence that Preferred Risk acted toward Filasky in an aggravated, outrageous, malicious, or fraudulent manner, or that Preferred Risk was guided by an evil mind which either consciously sought to injure Filasky or acted intentionally, knowing that its conduct was likely to cause unjustified, significant damage to Filasky, is slight and inconclusive at best. Therefore, the trial judge erred in submitting the issue of punitive damages to the jury.

Likewise, in *Gurule v. Ill. Mut. Life & Cas. Co.*, 152 Ariz. 600, 602–03 (1987), the court held that:

> If juries could award punitive damages without proof of anything more than bad faith, insurance companies may be overdeterred, and may pay legitimately questionable claims to avoid the risk of a punitive damages award. Such a result would be bad policy as well as bad law. Insurance companies are not liable for punitive damages every time they commit a tort; something more is required.

The evidence adduced by Plaintiff only permits a reasonable inference of bad faith, not an inference of the evil mind necessary to support punitive damages.

. . .

The only genuine factual dispute in this case is whether Ms. Payton was made aware of the January 17 fax that Dr. Gause sent to Ms. Zadina seeking surgery authorization for Plaintiff. As is required at the summary judgment stage, the Court construes this factual ambiguity in Plaintiff's favor and assumes that Ms. Payton was apprised of the contents of the fax shortly after Ms. Zadina's receipt thereof. But even if that assumption holds true, Plaintiff's evidence only demonstrates that Ms. Payton, and by association Defendant, failed to take appropriate action on Plaintiff's claim between January 17 and March 30, when Ms. Payton finally commenced meaningful administration of Plaintiff's claim. Crucially, there is no evidence that Ms. Payton intentionally delayed the processing of Plaintiff's surgery request. Indeed, neither side has presented any explanation for Ms. Payton's delay. An objectively unreasonable delay is of course germane to the question of whether Defendant's conduct was tortious, but it cannot support the conclusion that Defendant acted outrageously in conscious disregard that its conduct created a substantial risk of tremendous harm to others. Plaintiff would have the Court infer an evil mind from the bare fact of an unreasonable delay, but such an inference is contrary to the law in Arizona. As already discussed, "groundless" conduct and an "inadequate[] investigat[ion]" are not by themselves sufficient to support punitive damages. *Filasky*, 152 Ariz. at 599. "[E]vidence of 'something more' than indifference to facts and failure to properly and timely investigate an insurance claim must exist before the trial court can instruct the jury on punitive damages." *Id.* Here, as in *Filasky*, Plaintiff seeks to receive punitive damages for the same conduct that potentially entitles her to compensatory damages. The element of outrage is missing.

Likewise, the other delays attributable to Defendant following March 30 are insufficient as a matter of law to entitle Plaintiff to punitive damages. Plaintiff highlights the fact that Defendant insisted upon receiving a written summary of the verbal peer-to-peer discussion between Dr. Kopacz and Dr. Gause. (Response at 10.) This insistence, coupled with Dr. Gause's unexplained delay in providing his written medical opinion, resulted in Plaintiff's having to wait an additional two-and-a-half weeks for her

surgery authorization. No reasonable juror could find that an insurance company's desire to possess evidence in writing constitutes outrageous conduct. Finally, Plaintiff points to the delay that elapsed between Dr. Gause's transmission of his medical opinion on May 19 and Defendant's issuance of the surgical authorization on June 9. Neither party attempts to explain the reason for this delay. But as already noted, an unreasonable delay alone is legally insufficient to entitle a plaintiff to punitive damages in a bad-faith insurance case. A finder of fact would need to engage in speculation to conclude that the evidence in this case demonstrates not only a breach of the covenant of good faith and fair dealing but also the commission of outrageous conduct guided by an evil mind. The Court cannot send the issue of punitive damages to the jury, as doing so would be tantamount to countenancing such guesswork in contravention of the Arizona Supreme Court's admonition that "slight and inconclusive" evidence of outrageousness should not be submitted to a jury. *See Filasky*, 152 Ariz. at 599.

Thus, although the Court agrees with Plaintiff that a reasonable jury could conclude that Ms. Payton effectively received the January 17 fax on or around January 17, the Court disagrees that a reasonable jury could conclude upon the evidence presented here that Defendant "deliberately" failed to act upon the January 17 fax or that Defendant pursued a "strategy" of illegitimate delay. (*See* Response at 15.) Similarly, the Court rejects as unsupported by the evidence Plaintiff's assertion that "[t]he instigation of an ICA proceeding is the only thing that spurred American Zurich to comply with its obligation to adjudicate Ms. Torres's claim," as the undisputed evidence shows that both Ms. Payton and Dr. Kopacz had commenced adjudicating Plaintiff's claim in late March and early April, before Plaintiff filed a grievance with the Industrial Commission. (*See* Response at 15.)

Plaintiff cites three cases that purportedly demonstrate the propriety of punitive damages in the instant case, but Plaintiff's cases are distinguishable and only confirm the unavailability of punitive damages here. In *Mendoza v. McDonald's Corp.*, 222 Ariz. 139, 158–59 ¶¶ 64–67 (Ct. App. 2009), the Arizona Court of Appeals held that punitive damages

were appropriate based upon evidence that McDonald's "consciously waited many months before approving carpal tunnel surgery," "terminated Mendoza's temporary total disability benefits even though it did not know whether it actually had light-duty work available for Mendoza," "took the position Mendoza had not timely protested its denial of carpal tunnel surgery—a position that was completely without merit," undertook deliberate actions for the express purpose of supporting its antecedent denial, engaged in impermissible "doctor shopping," generally conducted itself "for the purpose of 'cutting' or closing Mendoza's claim," and finally terminated benefits based upon the claimant's inability to speak English, a fact that McDonald's had been apprised of all along. The facts of *Mendoza* are far more outrageous than the facts presented here, which involve an inexplicable period of inactivity followed by an attempt to rectify that inactivity. Another case from the Arizona Court of Appeals, cited by Defendant but not relied upon by Plaintiff, illustrates the sort of conduct that the Arizona judiciary deems outrageous. In *Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 230 Ariz. 592, 605 ¶ 62 (Ct. App. 2012), the plaintiff presented evidence that the defendant "instituted an aggressive company-wide profit goal," "assigned to the claims department a significant role in achieving that goal," "aggressively communicated this goal to the claims department," "tied the benefits of claims offices and individuals to, among other things, the average amount paid on claims," and "implemented these actions without taking steps to ensure its efforts to drive up its corporate profits would not affect whether it treated its insureds fairly." Thus, "the jury could reasonably find the decisions MetLife made in adjusting the Nardellis' claim were driven by financial self interest and not by the merits of the Nardellis' claim or the terms of their MetLife policy, and therefore, MetLife acted outrageously and with the requisite evil mind." *Id.* (internal citation omitted). The kind of evidence that informed the decisions in *Mendoza* and *Nardelli* is notably lacking in the instance case.

The other two cases cited by Plaintiff are from this District. In the first, an insurance adjuster "knew she had made a miscalculation, knew that Haney was owed retroactive payments, knew that Haney's representatives had repeatedly requested these payments,

knew that ICA had ordered these payments, and yet did nothing to make the payments for ten months." *Haney v. ACE Am. Ins. Co.*, No. CV-13-02429-PHX-DGC, 2015 WL 3750777, at *3–4 (D. Ariz. June 16, 2015). In the second case, an insurance adjuster unjustifiably delayed the processing of a claim for almost a year and then delayed issuing payment for another three months even after approving treatment. *Gastelo v. Wesco Ins. Co.*, No. CV-18-02659-PHX-MTL, 2020 WL 1285912, at *1–2 (D. Ariz. Mar. 18, 2020). In both *Haney* and *Gastelo*, the court held that the extent of the delay, roughly a year in each case, was sufficient to demonstrate that the respective defendants had acted with an evil mind. Although the analysis in *Gastelo* was extremely brief, the analysis in *Haney* was more robust and primarily relied upon language from the Arizona Supreme Court's opinion in *Gurule*. *See Haney*, 2015 WL 3750777, at *4.

> In *Gurule*, the high court wrote that:
>
> Even if the defendant's conduct was not outrageous, a jury may infer evil mind if defendant deliberately continued his actions despite the inevitable or highly probable harm that would follow. . . . In summary, the propriety of awarding punitive damages turns upon the defendant's state of mind. Intent to injure or defraud, or pursuit of wrongful conduct with conscious disregard of the probability of some injury or damage to the rights and interests of others all qualify as forms of "evil mind," justifying imposition of punitive damages. We abandon such terms as "gross," "reckless," and "wanton" conduct. They convey little, and fail to focus the jury's attention on the important question—the defendant's motives. . . . The more outrageous or egregious the conduct, the more compelling will be the inference of "evil mind."

*Gurule*, 152 Ariz. at 602. It is unclear whether that language from *Gurule* survived the Arizona Supreme Court's subsequent opinion in *Swift*, which was a decision expressly aimed at "clarify[ing]" the law of punitive damages. *See Swift*, 253 Ariz. at 502 ¶ 1. Therein, the court quoted the foregoing language from *Gurule* and described it as having "muddied the waters." *Id.* at 505 ¶ 16. Nevertheless, the court did not overturn *Gurule* and instead cited other portions of the opinion with approval. Moreover, the court distinguished *Gurule* on the basis that, unlike *Swift*, it was not a negligence case. *Id.* On the other hand,

*Swift* resurrected the terms "gross" and "reckless" in a clear departure from *Gurule*, and *Swift* also affirmed that punitive damages require "something more" in cases involving "tortious conduct of any kind, intentional or negligent," which of course includes the tort of insurance bad faith. *See id.* at 505–07 ¶¶ 18–26. Based upon these precedents, this Court is unsure whether the Arizona Supreme Court would countenance the holdings from *Haney* and *Gastelo*, in which the requisite "something more" was simply the underlying bad-faith conduct extended over a lengthy period of time, in each case approximately a year. In other words, it is not clear whether punitive damages are appropriate under Arizona law where the outrageous conduct differs from the base tort in degree, but not in kind.

However, the Court need not attempt to resolve that issue here, as the facts of this case are not nearly as extreme as those of either *Haney* or *Gastelo*. The delay attributable to Defendant's conduct in the instant case is only a fraction of that caused by the defendants in *Haney* and *Gastelo*. The Court finds that the delay engendered by Defendant's conduct, which was less than four months even if the facts are construed in favor of Plaintiff, does not rise to a level of outrage sufficient to support punitive damages.

Plaintiff's final argument is that punitive damages are appropriate because Defendant paid Ms. Payton a bonus at the end of 2023. According to Plaintiff, the fact that Ms. Payton received a year-end bonus "reflect[s] that Payton's conduct aligned with American Zurich's goals for their adjusters." (Response at 2.) The Court disagrees. Plaintiff has not provided adequate, or indeed any, foundation that could render the fact of Ms. Payton's bonus probative in the manner that Plaintiff now suggests. For instance, without knowing how many cases Ms. Payton handled in 2023, how satisfactorily she handled those cases, how Defendant determined who was to receive bonus pay in 2023, how many adjusters Defendant issued bonus pay to in 2023, how much bonus pay Defendant disbursed to its adjusters on average, and how much bonus pay Defendant issued to Ms. Payton, there is no basis upon which a reasonable finder of fact could conclude that Ms. Payton's receipt of an annual bonus indicates that Defendant approved of her handling of Plaintiff's claim. Defendant asserts that "adjusters have responsibility over at least a

hundred claims on any given day" and that "Payton was not rewarded for her performance on one specific claim." (Reply at 9.) Those statements are unsubstantiated by competent evidence, but they nevertheless highlight the speculative nature of the significance of Ms. Payton's bonus pay.

For all of the foregoing reasons, the Court concludes that punitive damages are unavailable as a matter of law. As stated above, nothing written herein shall constitute an adjudication of any issue related to Plaintiff's underlying tort claim.

**IT IS THEREFORE ORDERED** granting Defendant's Motion for Partial Summary Judgment (Doc. 37).

**IT IS FURTHER ORDERED** that, the dispositive motion deadline having passed and there being no other pending motions, the Court shall set a status conference by separate Order.

Dated this 19th day of February, 2025.

Honorable John J. Tuchi
United States District Judge